Filed 7/17/24  In re M.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re M.W., a Person Coming Under the Juvenile Court Law. | D083860 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. NJ15474B) |
| Plaintiff and Respondent, | |
| v. | |
| J.W. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge.  (Retired Judge of the San Diego Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant J.W.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant Ma.W.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

J.W. (Mother) appeals the juvenile court's order denying her request at the 18-month review hearing to return her son, M.W., to her custody. (Welf. & Inst. Code,[1] § 366.22.) Mother contends insufficient evidence supports the court's finding there would be a substantial risk of detriment to M.W.'s physical or emotional well-being if he returned to Mother's care. Ma.W. (Father) joins Mother's argument and states, "if this Court reverses the juvenile court's findings and orders vis-à-vis [Mother's] reunification services, then he requests that this Court remand the matter to the juvenile court with instructions for it to reinstate [Father's] reunification services."

As we shall discuss, we conclude Father has not provided a sufficiently particularized argument in support of his contention that his reunification services should be reinstated, nor has he explained why Mother's arguments apply equally to his claim. Thus, he has forfeited his claim on appeal. Moreover, we are unpersuaded by Mother's challenge to the juvenile court's finding of detriment, and we affirm.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Events Leading to Dependency*

Mother and Father share three minor children, X.W., M.W., and G.W. (collectively, the children).[2] The family came to the attention of the San Diego County Health and Human Services Agency (Agency) when, between 2018 and 2022, the Agency received over 40 referrals that included allegations of physical and emotional abuse, and general neglect of the children. The Agency learned Mother had a history of drug use and mental health issues, and that the parents' relationship included past incidents of domestic violence.

In July 2022, law enforcement was called to the family's apartment complex on two occasions. On July 9, law enforcement received a complaint that the children were shooting a neighbor's dog with a toy gun from their balcony. The children also threw toys at the neighbor and attempted to break windows. Officers tried to make contact with Mother but she did not respond to their questions and she told X.W. to close the apartment's windows.

On July 27, police again responded to the family's apartment complex when they received a complaint that the children were throwing diapers at passing vehicles. The reporting party also alleged one of the children was carrying a knife and threatening to stab a maintenance worker. When officers arrived, they observed M.W. running with a six-inch steak knife. G.W. hit one of the officers with a bag of dog feces. Mother told the officers

_____

[2]    At the time dependency proceedings were initiated, X.W. was 10 years old, M.W. was seven years old, and G.W. was six years old. X.W. and G.W. are not the subjects of this appeal and are discussed only when relevant.

3

the children had escaped from the apartment through the second story window and that she had no control over them.

G.W. and M.W. expressed an intent to "murder" the police officers. Based on this homicidal ideation, the officers took the children to the hospital for a psychological evaluation. Mother followed the officers to the hospital and blocked the ambulance bay with her car. She threatened to kill herself during a verbal altercation with one of the officers.

X.W. disclosed a bruise on her leg at the hospital, and she alleged Mother caused the injury when she hit X.W. with an electrical cord. When an officer told X.W. he was sorry Mother hit her, X.W. responded, "it's okay it happens a lot and I'm used to it." Police arrested Mother for willful cruelty to a child (Pen. Code, § 273a), and the children were transported to Polinsky Children's Center.

Father was not present during the incident. He told an Agency social worker that he resided at his workplace during the week and returned to the family home on the weekends. Father claimed the issues with the children were because of the neighbors, who were "bullying the kids, [and] telling [the] kids to jump off the balcony."

## II.

### *Initial Dependency Proceedings*

The Agency petitioned the juvenile court pursuant to section 300, subdivision (b)(1). The petition alleged M.W. suffered, or was at substantial risk of suffering, serious physical harm or illness as a result of the parents' inability to adequately supervise or protect him. Specifically, the petition discussed the July 2022 incident in which Mother left the children unsupervised and officers observed M.W. running through the apartment complex with a knife.

4

At the August 2022 detention hearing, the juvenile court made a prima facie finding that M.W. was a person described by section 300, subdivision (b). The court also found there was a substantial danger to M.W.'s health, or a risk he would suffer severe emotional damage, should he remain in the parents' custody. Accordingly, the court detained M.W. in out-of-home care, finding there were no reasonable means by which M.W.'s physical or emotional health could be protected absent his removal. The court permitted the parents liberal supervised visitation.

Thereafter, at the October 2022 jurisdiction and disposition hearing, the court sustained the allegations in the petition. The court ordered M.W. placed in a licensed group home or short-term residential therapeutic program, finding his return to the parents' care would pose a substantial risk to his physical or emotional well-being. The court required the Agency to provide the parents reunification services. Mother's case plan required her to participate in individual therapy, continue to see her psychiatrist, and comply with all medication prescribed by her psychiatrist.

## III.

### *Reunification Period*

During the initial reunification period, the Agency reported it struggled to work cooperatively with Mother. She repeatedly made allegations against Agency social workers, and she blamed her neighbors, the Agency, and law enforcement for the children's removal from her care. Mother told an Agency social worker, "I'm charging you with perjury. Something bad is going to happen. I got the police report and there are two different reports. I have to go to the FBI to sue the police department." Then, during a virtual child family team meeting, Mother accused the social worker of falsifying documents and stated, "she's lying. I'm out of here, fuck all you people."

Mother had to be muted several times during the meeting due to her frequent interruptions and inappropriate language.

M.W.'s physician contacted the Agency to disclose his concerns about Mother's behavior during one of M.W.'s medical appointments. Mother accompanied M.W. and his caregiver to the visit, and she was argumentative with the physician in M.W.'s presence. Mother claimed M.W.'s doctors were lying about changes to M.W.'s medication dosage, and "in a pressured, upset, tense, rambling and somewhat accusatory manner," Mother asserted that another dosage was better.

The Agency reported concern at Mother's behavior during her supervised visitation with the children. During a visit with X.W. and M.W., Mother made several accusations in the presence of the children, including: the Agency social workers and the juvenile court judge had "all lied"; the neighbors in their apartment complex were "out to get them;" and the children could not return home because the social worker received money for children involved in dependency proceedings. Mother also faulted X.W. for the dependency case, telling her, "you did things to put us here." X.W.'s caregivers refused to supervise visitation with Mother after she made multiple disparaging comments about them and disclosed their confidential address to the police.

Consequently, in February 2023, the Agency filed a section 388 petition requesting the court modify its prior order permitting Mother liberal supervised visitation. The Agency asked the court to require Mother's visitation with M.W. to be supervised in a therapeutic setting only. The Agency cited to Mother's defiant and combative behavior towards M.W.'s medical team and the Agency's staff. At the six-month review hearing, the

court granted the Agency's request. The court also required Mother and the children to undergo psychological evaluations.

M.W.'s psychological evaluation noted a history of aggression and behavioral issues that it attributed to "past parental neglect, chaos and general lack of structure in the family home." He was diagnosed with attention deficit/hyperactive disorder, and he was previously diagnosed with oppositional defiant disorder (ODD). The parents had attempted to treat his ODD with "essential oil[s]," rather than medication.

Examples of M.W.'s behavioral issues during the reunification period included incidents in which he slapped another student in the face at school, threw his caregiver's cat, smeared feces on his caregiver's walls, and shouted racial epithets at his caregiver. M.W. and his siblings displayed violent and dangerous behavior during their visitation. Nonetheless, the Agency reported that after M.W. commenced therapy and received increased medication, his behavior started to improve.

Mother's therapist diagnosed her with posttraumatic stress disorder and reported that she exhibited symptoms of borderline personality disorder. Her therapist opined that Mother struggled to take "ownership of her issues and how they impact the relationship with her kids." She believed Mother's behavior had contributed to the children's psychological issues.

In a September 2023 report, the Agency averred that Mother's behavior with the Agency, and her conduct during supervised visitation with the children, had improved. Mother's therapist reported she was developing insight into her behavior and becoming less reactive. She completed an anger management class, a conflict resolution class, and parenting classes. Consequently, the Agency considered the possibility of expanding Mother's visitation with X.W. to be unsupervised.

However, on September 27, 2023, Mother was placed on an involuntary psychiatric hold.  Her treatment team informed the Agency that she was "displaying paranoid ideations and was very combative and not cooperating."  Mother accused her therapist of attempting to sex traffic her, and a nurse at the hospital reported she was "[v]ery agitated, talking about human trafficking, [and] paranoid about everybody there."  Mother told the Agency that she believed someone tried to kidnap her.  When an Agency social worker asked Mother if she thought she would test positive for methamphetamine or fentanyl, Mother responded, "[p]robably."

At the 12-month review hearing, the juvenile court again found M.W. could not be returned to the parents' care without a substantial risk of detriment to his physical or emotional well-being.  The court ordered Mother to continue to comply with the Agency's case plan and permitted her supervised visitation.  The court then set an 18-month review hearing pursuant to section 366.22.

After the 12-month review hearing, M.W.'s caregiver reported that Mother appeared to be under the influence during a supervised visit with M.W.  She observed Mother "driving reckless, running up on curbs, stopping hard at the last minute."  The caregiver heard Mother say that she "didn't want any of the kids back," and later say, "maybe I'll take [M.W.] back."

Mother was hospitalized in November 2023 related to an infection on her hand.  She was discharged from the hospital after she became verbally combative with hospital staff.  The maternal grandmother reported that hospital staff found drug paraphernalia and opiates in Mother's bag.

M.W.'s caregiver suffered a medical emergency in November 2023 that required M.W. to be removed from her care and placed at Polinsky Children's Center.  M.W.'s behavior then began to deteriorate.  During one visit between

M.W. and his siblings at the maternal grandmother's home, the children caused extensive damage to her residence, yard, and car. M.W. keyed his grandmother's car with the words "Fuck Bitch." At school, M.W. called his classmates racial slurs and he assaulted one of his classmates. School staff had to escort M.W. around the campus to protect other students from M.W.'s hostility.

The Agency reported it was unable to find suitable placement for M.W. because of his escalating behavior. M.W. was verbally and physically assaultive with staff and his peers at Polinsky Children's Center. M.W. hit, kicked, and spit at the staff, tried to stab them with various objects, destroyed property, set off fire alarms, and used racial slurs. Due to M.W.'s complex behavioral needs and the instability of Mother's mental health, the Agency assessed that M.W. faced a significant risk of harm if he returned to Mother's care.

That Agency reported that Father had inconsistent visitation with the children throughout the dependency case. He did not visit them at all between August 2023 and November 2023. Thus, the Agency opined that M.W.'s placement with Father would also create a substantial risk of harm, and it recommended that M.W. remain in out-of-home care.

IV.

*Contested Section 366.22 Hearing*

On March 22, 2024, the juvenile court conducted a contested 18-month review hearing. (§ 366.22, subd. (a).) Without objection, the court received into evidence a court-appointed special advocate report and several Agency reports. The court heard testimony from Mother and the Agency's social worker. Father stipulated that, if called upon to testify, he would testify he had been visiting M.W. every Sunday.

9

Mother testified she had been in therapy for three or four years. However, as of the section 366.22 hearing, she was no longer seeing her therapist and her psychiatric services had recently been terminated. Mother reported that she had developed a safety plan with her psychiatrist, and she proffered she was able to reach out to a network of resources if she experienced any mental health issues. She stated that she recently signed up with a new therapist, and she was in the process of obtaining housing.

Mother expressed that she did not believe all three children should be returned to her care because "it would be too much for [her] to handle all three children right now." However, Mother asked the court to return M.W. to her custody. She testified that she shared a "strong relationship" with M.W., and she believed she was able to "focus on one child."

On cross-examination, Mother testified that her prior therapist falsely accused her of meeting a boyfriend at 7-Eleven and had falsely accused her of making claims that she was being sex-trafficked. She also stated her neighbors had called the police simply because Mother raised her voice. Mother alleged the police "kidnapped" her children because she refused to open the door.

The Agency social worker testified the Agency was recommending M.W.'s placement with a willing relative or a foster home because he was not suitable for adoption at the time. She explained the Agency was not recommending M.W.'s return to Mother's care because of Mother's instability during the proceedings. She cited to Mother's accusations against her therapist and her accusations that the Agency had stolen her children. Additionally, she opined that Mother had not taken accountability for the issues that led to dependency.

Following the presentation of evidence, counsel for the Agency asked the court to "find that it would be detrimental to return the children to either parent." He pointed to Mother's testimony in which she accused the police of kidnapping her children. Counsel proffered that Mother's testimony demonstrated there had been no progress in this case "that would show the children can be safely placed with" either parent.

M.W.'s guardian ad litem agreed that M.W.'s return to Mother's care would be detrimental. He expressed concern at Mother's testimony that her children had been kidnapped by the police, and he opined that Mother's mental health had been an issue throughout the case. However, the guardian ad litem represented that M.W. wished to be returned to Mother's care.

Mother asked the court to continue her reunification services for X.W. and G.W., and to return M.W. to her care. She argued the evidence demonstrated she was safe and that she had not harmed the children. She proffered that she understood M.W.'s needs and was committing to meeting them.

After considering the parties' arguments, the court ordered foster care as the permanent plan for M.W. and terminated reunification services. The court found the evidence clearly demonstrated neither party was ready for the return of "all of the kids or any one of the kids," and that M.W.'s return to the parents' care would create a substantial risk of detriment to his physical or emotional well-being. However, the court commended Mother on her insight that she was not ready for the return of all three children. The court speculated that there may be a point in the future in which M.W. could safely return to Mother's care if she consistently engaged with her therapist and demonstrated an understanding of M.W.'s needs.

This appeal followed.

## DISCUSSION

Mother argues insufficient evidence supports the juvenile court's finding that M.W.'s return to Mother's custody would create a substantial risk of detriment to his physical or emotional well-being. Father purports to join Mother's arguments and posits, "if this Court reverses the juvenile court's findings and orders vis-à-vis [J.W.], returns custody of [M.W.] to her and/or reinstates [J.W.'s] reunification services, then he requests that this Court remand the matter to the juvenile court with instructions for it to reinstate [Father's] reunification services." We disagree with their contentions and affirm.

During dependency proceedings, the juvenile court must return a child to the care of their parent at the 18-month hearing unless the court determines the return of the child "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.2, subd. (a).) The Agency bears the burden of establishing detriment. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)

12

The standard for showing detriment is " 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*Ibid.*)

We review a juvenile court's finding of a substantial risk of detriment for substantial evidence. (*Yvonne W., supra*, 165 Cal.App.4th at p. 1400.) Under this standard, "we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) The party challenging the juvenile court's detriment finding has the burden to show that substantial evidence does not support the finding. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Here, as an initial matter, Father has failed to provide particularized legal argument in support of his contentions, and he has therefore waived his claim on appeal. "Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as waived, and pass it without consideration. [Citations.]" ' [Citation.] 'Joinder

13

may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations].' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.)

Father avers that he joins the arguments set forth in J.W.'s opening brief, and he contends this court should reverse the juvenile court's order terminating Father's reunification services if we reverse the court's placement order or services order as to Mother. However, Father does not argue that insufficient evidence supports the court's order terminating his reunification services, nor does he explain why a reversal of the court's detriment finding as to *Mother* would warrant the reinstatement of *his* services. In other words, Father has not explained why Mother's arguments apply equally to both parties, nor has Father proffered any legal authority or argument in support of his position. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].) Accordingly, Father's briefing does not attempt to meet his burden of demonstrating error on appeal, and we therefore treat his claim as waived.

Nevertheless, even assuming Father's joinder was proper, we conclude substantial evidence supports the juvenile court's detriment finding. "In evaluating detriment, the juvenile court *must* consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Yvonne W., supra*, 165 Cal.App.4th at p. 1400, italics added.)

14

Here, although Mother did complete various aspects of her case plan, including an anger management class and parenting classes, her testimony during the section 366.22 hearing demonstrated a lack of insight into the issues that led to dependency and M.W.'s removal. She testified that her therapist made false allegations against her and that the police had kidnapped her children. She did not acknowledge the children's dangerous behavior when they were left unsupervised at the family's apartment complex, but instead claimed the neighbors contacted police simply because she raised her voice.

Moreover, Mother ceased participating in therapy and meeting with her psychiatrist as of the section 366.22 hearing. Mother's case plan required her to participate in therapy, and her behavior throughout the dependency proceedings demonstrated a need for such services to facilitate M.W.'s safe return to her care. Mother repeatedly demonstrated hostility towards Agency social workers, M.W.'s doctors, the children's caregivers, and her own therapist, often in the presence of the children. M.W.'s high level of needs required therapeutic intervention, and Mother's behavior, when left untreated, demonstrated she was unable to cooperate with M.W.'s treatment team and effectively meet his needs.

Although Mother did experience a period of improvement, she was later placed on an involuntary psychiatric hold. Then, around seven weeks after the psychiatric hold, she was discharged from a hospital due to her combative behavior with the hospital's staff. The maternal grandmother reported that drug paraphernalia was found in Mother's belongings during this incident. That same month, M.W.'s caregiver disclosed that Mother appeared to be under the influence during her supervised visit with M.W. These incidents

15

demonstrate a lack of progress towards eliminating the issues that led to M.W.'s removal from the home.

Moreover, "while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency (§ 366.22, subd. (a)), the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) In this regard, "[d]etriment can be shown many different ways." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059.)

M.W.'s behavioral issues throughout the dependency proceedings were significant, and he required a high level of care that Mother failed to demonstrate she was able to provide. M.W. committed repeated acts of violence towards his peers and siblings, destroyed property, and shouted racial epithets at other children and his caregiver. Although M.W.'s psychological evaluation indicated he was capable of overcoming the negative effects of his past family dysfunction that had contributed to his behavioral issues, the Agency did not believe M.W. would have the structure and stability to safely progress if he was returned to Mother's care at the time of the section 366.26 hearing. The evidence provides ample support for this assessment and the juvenile court's ultimate finding that M.W.'s return to Mother's care would endanger his physical or emotional well-being.

Mother's reliance on *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B.*), and *Yvonne W., supra*, does not compel a contrary result.

In *David B.*, the juvenile court found at the 18-month review hearing that a dependent should not be returned to the parent's care even though the parent had done "virtually everything [the Agency] requested of him, and

16

then some." (*David B., supra*, 123 Cal.App.4th at p. 772.) The juvenile court's finding of detriment stemmed from evidence of another adult living in the parent's residence, the parent's frequent consultation with the foster parent and social worker regarding the child's care, and the court's belief that the parent was "simply unprepared" for the child's return. (*Id.* at pp. 790-794.). On appeal, the *David B.* court concluded this evidence was insufficient to establish detriment. (*Id.* at p. 798.) The court clarified that, in evaluating detriment, the juvenile court should consider the parent's "grasp of the important parenting concepts—things such as a child's need for security, adequate nutrition and shelter, freedom from violence, proper sanitation, healthcare, and education." (*Id.* at p. 790.)

In *Yvonne W., supra*, a child became a dependent of the juvenile court due to the parent's drug use. (*Yvonne W., supra*, 165 Cal.App.4th at p. 1398.) The parent made progress in her reunification plan and obtained stable housing at a shelter that permitted her to reside with her children. (*Id.* at pp. 1397-1398.) However, at the 18-month review hearing, the Agency recommended against returning the child to the parent's care because, among other factors, the parent and child still needed to participate in conjoint therapy. (*Id.* at p. 1399.) The juvenile court adopted the Agency's recommendation and made a finding of detriment. (*Ibid.*) On appeal, the *Yvonne W.* court reversed, concluding that although conjoint therapy may have benefitted the parent-child relationship, "[n]othing in the record supports a finding that without conjoint therapy, [the child] will be at substantial risk of detriment in [the parent's] care." (*Id.* at p. 1403.)

The facts of this case are much different than those in *David B.* and *Yvonne M.* The evidence of Mother's mental and emotional instability was significant, and her treatment provider opined that her behavior had

contributed to the M.W.'s psychological issues. These psychological issues led to incidents in which M.W. acted violently towards other children and expressed an intent to murder police officers. Thus, the requirement that Mother attend therapy was not merely to benefit the parent-child relationship like in *Yvonne M.*, but was intended to ensure Mother's mental stability so she was able to safely meet M.W.'s high level of needs. And unlike *David B.*, Mother's behavior did not suggest she was simply unprepared for M.W.'s return. Her behavior reflected an inability to maintain the stability and consistency that M.W. required to safely interact with other children, attend school, and return to the family home.

In sum, the evidence of detriment before the juvenile court was substantial and demonstrated that the return of M.W. to Mother's care posed a danger to his well-being. Mother's lack of progress in eliminating the issues that led to M.W.'s removal supports the conclusion that she was unable to provide the protection and security M.W. required as he struggled with significant behavioral issues. Although we do not discount Mother's efforts at reunification that she emphasizes in her briefing on appeal, or the challenges she faced managing M.W.'s behavior, we must resolve all inferences from the evidence in favor of the juvenile court's finding. Doing so, we conclude substantial evidence supports the juvenile court's finding and we affirm.

## DISPOSITION

The juvenile court's order is affirmed.


O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

CASTILLO, J.