Filed 9/3/24  G.D. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| G.D. et al, | |
| Petitioners, | A170745 |
| v. | (Sonoma County Super. Ct. |
| THE SUPERIOR COURT OF SONOMA COUNTY, | Nos. 6709-DEP, 6710-DEP, 6711-DEP, 6712-DEP) |
| Respondent; | |
| SONOMA COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES AGENCY, | |
| Real Party in Interest. | |

In this dependency proceeding, G.D. (Mother) filed a petition for a writ of mandate challenging the dependency court's order terminating services designed to reunify her with her four children (collectively, the Children) and setting a permanency planning hearing under section 366.26 of the Welfare and Institutions Code (.26 hearing).  R.S. (Father) filed a notice of intention to file his own writ, but never filed one.[1]

---

[1] We refer to Mother and Father collectively as Parents, even though only Mother seeks relief here.

Mother argues there was no substantial evidence to support the dependency court's finding of a substantial risk of detriment to the Children if they were returned to her care. To support her argument, she claims she completed her case plan and ameliorated the original conditions that led to removal, an unsanitary and unsafe home coupled with verbal arguments exacerbated by alcohol. She also argues that a mental breakdown she suffered during her efforts to reunify did not cause detriment and she is amenable to abide by whatever she is asked to do so that the Children may be placed in her care with a family maintenance plan.

The Sonoma County Department of Health and Human Services (the Department) filed a return to Mother's writ petition, contending the dependency court was within its discretion to terminate services and set a .26 hearing.

Having reviewed the record, we see no error and will deny writ relief.

**I.**

**A.**

Appellate courts review a dependency court's finding of detriment for substantial evidence, asking only whether the finding is supported by evidence that is " 'reasonable, credible[,] and of solid value . . . .' [Citation.]" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.) We construe the record in the light most favorable to the dependency court's findings. (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.) We "do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.) The issue of whether placement of children with their parent would be detrimental is to be examined by looking at the totality of the circumstances. (*A.H. v. Superior*

2

*Court* (2010) 182 Cal.App.4th 1050, 1059 ["[d]etriment can be shown many different ways"] (*A.H.*).)

## B.

Looking at the totality of circumstances here, substantial evidence supports the dependency court's finding that returning the Children to Mother's custody would create a substantial risk of detriment to their safety, protection, or well-being. After full review of the record, we conclude there is substantial evidence to support the detriment findings the court made at the 18-month review hearing and we see no error in setting the .26 hearing. Although Mother participated diligently in her case plan, she failed to demonstrate any insight into the conditions facing the Children—unstable housing, substance abuse by Parents, and domestic discord between Parents, all of which was exacerbated by Mother's untreated mental illness. Nor did she show any awareness that these conditions were causing harm to the Children.

Mother places great emphasis on her compliance with her case plan. But even granting that Mother showed she had a consistent and largely positive record of visitation with the Children, and further granting that she met many of the other objectives of her case plan, compliance with a case plan is not dispositive. The issue of detriment is to be examined by looking at the totality of the circumstances. (*A.H.*, *supra*, 182 Cal.App.4th at p. 1059.) As explained by one court, "Detriment is a familiar standard in child welfare determinations; but . . . the notion of detriment is at best a nebulous standard that depends on the context of the inquiry." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.) Under this context-specific standard, Welfare and Institutions Code section 361.2, subdivision (a) gives dependency courts "broad discretion to evaluate not only the child's physical safety but also his or her emotional well-being." (*In re C.C.,* at p. 1490.)

## C.

What follows is a summary of the aspects of the record we find to be most important. It is drawn from the Department's periodic status review reports and from testimony presented at the 18-month hearing.

## 1.

Drug and alcohol abuse and instability of housing were major issues here. At the 18-month review hearing, the social worker explained that one of her top concerns regarding the Children's safety was how alcohol and mental health affected Parents' ability to maintain safe and secure housing, "which was the theme from the beginning." The juvenile court "may properly rely upon the agency's expertise for guidance." (*In re M.C.* (2011) 199 Cal.App.4th 784, 814.) The social worker testified that Parents' living situation during reunification was unstable overall. The Interfaith Shelter Network (IFSN) had difficulty at times working with Parents during reunification.

In the early stage of the reunification period and as services continued, the Department's assessment was that the family faced a great deal of uncertainty, as Parents were separated and not able to communicate about basic information regarding the Children, including visitation, homework, who would have primary custody if the Children were returned, and the general vision of what they wanted for the Children. The Department expressed concerns about Father's instability, as he was homeless and had no car, but also noted Father was acknowledging the benefits he received from his participation in a domestic violence group and therapy. The Department also referred to Mother's "recent mental health struggles."

Parents tried but were never successful in finding stable housing. After receiving a housing voucher, Parents worked with IFSN to locate housing. But IFSN had difficulty working with them. As of April 2024,

Parents had turned down multiple available units over the previous year for various reasons. Although they temporarily resided in IFSN's transitional housing program, they had to leave and were permanently banned from the program due to safety concerns regarding Mother's mental health. Parents' voucher was due to expire, but they were unwilling to enter an adult shelter. IFSN confirmed it was difficult to find a landlord willing to take on " 'high-risk' " tenants like Parents, and reported that Father was difficult to work with because he was easily triggered and had unreasonable expectations.

Parents refused to live in shelters and rejected homes offered to them for various reasons, including that the offered homes did not have a backyard, they could not keep their large pit bull dog, and/or they would not be allowed to smoke marijuana on the property. They also were banned from recommended transitional housing due to safety concerns. As a result, their living situation continued to be unstable throughout most of the reunification period, as they alternatively couch-surfed and lived in a relative's home, their vehicle, and a hotel room. The social worker did not believe that two months in an apartment cured Parents' history of unstable housing. She testified that it was "a good start" but could not say "with any consistency that it [would] continue to go well."

2.

Mother's continuing mental health difficulties remained a persistent concern to the Department throughout the reunification period. Until November 2023, Mother was seeing a therapist, Leslie Powers, to deal with these mental health issues, but she cut off communications with Ms. Powers that month. According to Ms. Powers, her last coherent conversation with Mother was in September 2023, when Mother was feeling pressured emotionally and distressed with relationships, housing, and reunification. Mother felt overwhelmed and did not want to talk about what was going on.

Ms. Powers reported that Mother was not able to answer questions and was giggly and acting silly. Mother demonstrated rapid thinking and made a few paranoid statements, such as stating it was not really her and she was triggered by people's voices.

Mother's texts to Ms. Powers around this time were distorted and odd. Ms. Powers believed Mother was showing clear signs of being in some kind of psychotic episode, possibly a manic episode with psychotic features. Mother also left her job, as she was feeling " 'weirded out' " and had odd perceptions and hallucinations. Ms. Powers expressed concern that Mother's mental health would continue to slip and did not know how long it would be before she was grounded. In December 2023, Ms. Powers reported that on November 2, 2023, Mother informed her that she did not want to meet anymore; in December, Mother reached out to Ms. Powers and said she was "choosing to work with a local therapist."

Mother reported that, in October and November 2023, she went to the Kaiser hospital three times seeking mental health help. The third time, she stayed at the hospital for six days to address her mental health issues. Mother said that she was taking two medications, one for " 'clear thoughts,' " which she took when she did not feel well mentally so the thoughts would go away. Mother declined to sign a release of information for her mental health records, so the Department could not verify her mental health records and medication. There were indications that medication helped, if Mother took what was prescribed for her. When meeting with Mother on November 30, 2023, the social worker noticed a remarkable difference in her communication. The social worker explained that Mother "was clearer with her thought process and emotions, and was thinking more logical than a

6

month previous[ly], where . . . [M]other was questioning if the [social worker] was physically real and if the [social worker] was still black."

**3.**

In April 2024, the social worker reported that Mother appeared to be making strides with getting her mental health back on track, taking medication, and reinstating therapy sessions with Ms. Powers, but opined there was not a substantial probability the Children would be returned to her care within the required timeframe. The social worker noted that Mother still did not have housing and had just started stabilizing her mental health.

Moreover, Mother admitted that during her psychotic episode, which took place in September or October 2023, she used some cocaine, though she claimed she only used it once and had not used again. She also had not drug tested since separating with Father.

The Department's assessments grew increasingly pessimistic about Parents' chances of regaining custody. It noted in December 2023, for example, that though Parents showed a lot of promise at the beginning of the case, after trying things their own way and contesting service providers, they had failed to make the behavioral changes necessary to provide a safe and sober home for the Children.

The Department received mental health records regarding Mother dated February 9, 2023 through November 28, 2023, which are in the record. They detail that, after four emergency room visits during which Mother expressed suicidal ideation, she was hospitalized and sent to Telecare Heritage, an intensive inpatient mental health facility. The Telecare Heritage clinical notes from November 22, 2023 indicate that Mother was admitted on a Welfare and Institutions Code 5150 as a danger to herself and that she reported suicidal ideation. Additionally, Father called and expressed concern that Mother had said she wanted to kill herself several

7

times over the previous two months, and there were concerns that she might be cutting herself. The notes further indicate that Mother had "a history of documented substance abuse and bipolar disorder."

According to Telecare Heritage's notes, Mother had a history of psychosis that predated her Fall 2023 mental breakdown, and her main concerns while in the program were auditory and visual hallucinations and depression and anxiety over the possibility of losing her children. While at Telecare Heritage, Mother was prescribed Zyprexa, an antipsychotic. The social worker reported in June 2024 that Mother's medical records indicated she willingly participated in the therapeutic program and responded well to the mix of psychotherapy and medications. But the social worker noted there was no record of any follow-up care upon Mother's exit from Telecare Heritage, and that Mother had previously confirmed with the Department that she did not pick up medications prescribed for her on discharge.

Referring to Telecare Heritage's notes, the social worker testified that Mother made four suicide attempts prior to her hospitalization. IFSN reported that Mother had expressed suicidal ideation and "was a danger to self, definitely," but there was also a "major concern" that "she was a danger to others." The social worker further testified that she did not believe Mother's psychotic break was a single event and had no reassurance a psychotic break would not occur in the future. She believed, based on her professional experience, that if Mother's mental illness was untreated, a crisis most likely would reoccur.

By April 2024, Mother was still struggling with her mental health. The social worker noted that Mother, while she was again working with a therapist, declined follow-up mental health care beyond talk therapy and was not under the care of a psychiatrist or other medical professional able to

8

prescribe psychiatric medications. Mother indicated she had stopped taking medication as she believed it was the sudden cessation of her previously prescribed anxiety medication that had caused her psychotic episode in the late Fall of 2023.

## 4.

In the updated status review submitted by the Department a few weeks before the 18-month review hearing in June 2024, the Department recommended termination of reunification services. In the assessment/evaluation section of the updated 18-month review report, the social worker noted the Department's main concern was Parents' failure to show consistent satisfactory demonstrations of stability that would indicate it was safe for the Children to return home.

The social worker also expressed concern about Mother's mental health stability, since she was not following the protocol set forth by Telecare Heritage at her discharge and the social worker could not confirm Mother was under the care of a psychiatrist again. The social worker was also concerned about the quality of the follow-up care Mother was receiving. Noting that Mother said she was taking Wellbutrin, which had been known to cause mania in bipolar clients, the social worker wrote, "As the Department had noted that [Mother's] psychotic break seemed to correlate with symptoms of mania, the Department is understandably concerned about a drug that may exacerbate those symptoms."

## 5.

At the 18-month hearing, the social worker testified that Mother had spoken about her psychosis, stating it was "caused by the stressors from the case and the sudden cessation of the anxiety medications she was on. So she believed as long as she didn't begin taking the anxiety medications again,

9

there was no risk of another psychotic episode. So she was not receiving follow-up care."

During the social worker's testimony, the court referenced a section of Mother's mental health records that noted Mother struggled with psychotic spectrum symptoms and remained "at high risk of rehospitalization." That section of the records also stated, "Warrants ongoing stabilization," and that the "patient is at high risk of . . . self-injury at this time." The social worker confirmed it was reported to her that Mother was addressing those issues with, as the court described, "her personal psychiatrist that we haven't heard from." She further testified that Mother was not able to participate in a lot of the medical appointments for the Children due to her conduct, as issues were raised when she was in her psychosis.

According to the social worker's testimony, Mother failed to engage in any sort of intimate partner violence training or education during the reunification period. Although the case plan was modified so Mother could receive the training through couples counseling, the couple's counseling never started on that issue due to Mother's psychotic break. Finally, the social worker testified to running the structured decision-making tool used to assess safety risk to return the Children to Parents' care, which generated an evaluative result showing "the safety risk was still high." The social worker confirmed her belief that it would not be safe for the Children to return to Parents and said her opinion would not be different if Parents were no longer a couple.

**6.**

At the conclusion of the 18-month review hearing, the court indicated it was more concerned about the evidence it did not hear than the evidence it did hear. The court noted that Mother's medical records from November 2023 clearly indicated that she remained at risk for rehospitalization if there

10

was not stabilization. The court observed that if it was the medication that caused Mother's psychosis, "it sure would have been nice for me to hear from a psychiatrist who would say yes, what happened here is something noted as a result of coming off medication, but I don't have that in front of me. Any psychiatrist, pharmacist, telling me about what coming off medication can do with your stabilization." But Mother presented no such testimony.

The court further noted that after several days in treatment, Mother was able to get a "grip on reality [and] do well", and that her medical providers ended up putting her on some medication. But the court pointed to the evidence that Mother then did not end up taking the medication after she left inpatient care and had no proof of follow-up care, as the nurse practitioner's records were not provided. Additionally, the court noted the evidence showed that Mother's mental breakdown was likely to reoccur. The court further explained, addressing Mother, "I know you have a safety plan, but if you don't believe there is a problem, you're not looking for it, and it might end up being too late. [¶] So I do believe that there is still danger to the children by being returned to your care today."

Having so found, and after further finding that reasonable services were offered or provided, the dependency court terminated reunification services and set a .26 hearing for October 10, 2024.

## D.

In following the Department's recommendation that services be terminated, it is quite clear the court found the social worker's testimony to be credible and corroborated by documentary evidence. As noted above, our review begins and ends with whether there was substantial evidence to support the dependency court's findings at the 18-month hearing. On this record, we have no trouble concluding there was.

11

## DISPOSITION

The petition for a writ of mandate is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.