Filed 4/3/25  Alana M. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| ALANA M., Petitioner, v. SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent; CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al., Real Parties in Interest. | A172451 (Contra Costa County Super. Ct. No. J2300683) |

Alana M. (Mother) petitions this court for extraordinary relief from juvenile court orders made at a 12-month review hearing in this dependency proceeding.  The court terminated Mother's reunification services for her 14-month-old son, E.M. (Minor), and set a hearing under Welfare and Institutions Code section 366.26 to select a permanent plan.[1]  Mother argues she made significant progress in her case plan; the juvenile court's finding of

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

no substantial probability that Minor would be returned to her by the 18-month review hearing was not supported by substantial evidence; and the juvenile court erred in terminating reunification services. She asks us to vacate the order for a section 366.26 hearing and direct the juvenile court to offer her additional reunification services. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *December 2023 through January 2024 – Detention and Jurisdiction*

On December 26, 2023, Contra Costa County Children and Family Services (Agency) filed a dependency petition on behalf of Minor, who was then one month old. The petition alleged that Minor came within the jurisdiction of the juvenile court under section 300, subdivision (j); that Minor's maternal half-brother, T.M., had been abused or neglected; and that there was a substantial risk that Minor would be abused or neglected. The petition alleged that Mother and Minor's alleged father (Father) were involved in a domestic violence incident in two-year-old T.M.'s presence, where Father physically assaulted Mother, who was six months pregnant with Minor, by forcing her to the ground with his hands while she was holding T.M. and by kicking her in the stomach and saying to Mother, "you're not going to have my baby; the baby is going to die today."[2] The petition alleged that Mother failed to adequately protect T.M. from the incident and that Father engaged in domestic violence in front of T.M. that posed a risk of harm or serious physical injury to Minor. Mother had an open dependency case involving T.M., and Father had open dependency cases involving three other half-siblings of Minor.

---

[2] Father remained an alleged father throughout the proceedings and is not a party to this petition; we discuss facts regarding him only insofar as they bear on the matter before us.

2

In its detention/jurisdiction report the Agency reported that when it contacted Mother in December 2023 in response to a referral alleging general neglect of Minor, Mother characterized what had happened in August 2023 when Father pushed her to the ground and kicked her as an "isolated incident." An emergency protective order had been issued against Father after the incident, but Mother allowed the order to expire. The social worker expressed concerns about the extreme nature of the violence and the risk to T.M. and Minor, asked about the expiration of the protective order, and asked Mother if she has had communication with Father. Mother denied communicating with Father. Mother agreed to file for a restraining order and provide proof that she had done so to the social worker, but then expressed fear that Father would retaliate if she followed through. After Mother missed several appointments with the domestic violence liaison and failed to file a request for domestic violence restraining order with the court, and after Father reported he had seen E.M., the Agency sought and received a protective custody warrant for E.M. Minor was placed in the same foster home as T.M., who had been detained from Mother in August 2023.

The Agency reported that Mother, who had a past history of arrests as a minor and had been in foster care herself, had engaged with services as a non-minor dependent after T.M.'s detention and was living in transitional housing. Father had a child welfare history as a minor, and an extensive history of misdemeanor and felony arrests and convictions as an adult from 2004 to 2022, including convictions for robbery, battery on a spouse, false imprisonment, and possession of a firearm.

The court ordered Minor detained. At the jurisdiction hearing Mother pleaded no contest to the allegations in the petition as amended.

3

B.    *February through April 2024 – Disposition*

In a disposition report, as modified on April 15, 2024, the Agency reported that Mother had started general education classes and planned to receive her G.E.D.  After E.M. was removed from her custody, Mother "began working diligently" on the case plan that had been created in connection with T.M.'s dependency.[3]  She had completed a four-hour online domestic violence class and was attending therapy once a week, and she had been granted a restraining order against Father, which would expire in March 2024 and was eligible for renewal.

The Agency also reported that after the jurisdiction hearing, the management of Mother's apartment complex complained to the Agency about suspected drug use and traffic in and out of Mother's apartment.  The Agency learned that Mother had allowed Father into the apartment.  Mother had weekly video calls with Minor and T.M., and had been accompanied by other adults during some of those calls.  One call was attended by an adult man known to T.M. as "E-Bo."[4]  After the call, T.M. regressed and verbalized to his caregivers, "E-Bo shot me.  E-Bo has a gun."  The Agency expressed concern that the complaints from the apartment complex and the video call incident reflected a lack of commitment on Mother's part to cultivate a safe environment in her home and community for herself and her children.  The Agency recommended the court adjudge Minor a dependent of the court and offer reunification services to Mother.

At the contested disposition hearing the court adopted the Agency's recommendations.  Mother's reunification plan required her to visit regularly

---

[3] Mother's reunification services for T.M. were terminated at the same time as her services for Minor.

[4] The Agency later reported that T.M. refers to Father as "Ebo."

4

with Minor, attend a parenting class, participate in a weekly domestic violence program, participate in weekly individual counseling with a mental health therapist with the goal of understanding and addressing the issues contributing to the dependency, and participate in a program of family counseling with Minor. The court ordered the Agency to arrange visitation between Mother and Minor for a minimum of two hours, twice per week, which could be supervised. The court scheduled a status conference in July 2024.

C. *July 2024 Status Conference*

In a memorandum prepared in advance of the status conference the Agency reported that at a meeting on May 10, 2024, Mother told the social worker that she was not speaking with Father or in a relationship with him, and that she had filed an application for a restraining order against Father and was waiting for a court date. Three days later, Mother called the Agency stating that Father tried to enter her home without her permission by climbing onto her balcony and trying to get in through the patio door, and that she had called the police, who arrested Father. According to the police report, a copy of which was attached to the memorandum, Mother told the police Father came to the apartment and punched or kicked the door so hard it could not be opened. Moments later, she heard a noise on the balcony, and discovered that Father had climbed onto the roof and accessed her second floor balcony. Mother told the police that in the past Father had physically assaulted her and vandalized her property. He smashed one window of her car the previous day, and smashed two windows in early April 2024. The police reported that when they arrived at the apartment the door had to be forced open, and the door and frame showed obvious signs of damage. Father told police he was concerned that Mother was with a man. Police confirmed

5

the existence of an emergency protective order protecting Mother from Father and found that the order had not been served, so an officer served Father at the jail, where he was booked for felony vandalism.

In early June 2024, Mother told the social worker that she saw herself and Father "as a family unit" and she wanted "to work it out with him." The social worker explained that the abuse inflicted on her and the harm to her children was serious and that Father was not receiving services or involved in a case plan. Mother acknowledged that what Father did was wrong, but said it happened only once and Mother did not believe it would happen again. The social worker explained that the Agency could not prevent her from being involved in a relationship of her choosing, but her involvement with Father affected the likelihood of the children being returned to her care, and that Father could not live in the same household as the children if he was not actively involved in a case plan. A few days later, Mother told the social worker that the initial report she made about Father was false, and that the purported domestic violence incident in August 2023 was actually a non-physical argument that occurred when Mother learned that Father was with another woman.

With respect to Mother's case plan, the Agency reported that Mother was attending domestic violence classes each week, and was enrolled in individual therapy and in family therapy with T.M. Mother's therapist reported that Mother had missed several sessions, and that Mother minimized the violence that had occurred and seemed unable to acknowledge the effect of that violence on the family. Mother's visits with Minor and T.M. went well, and Mother had missed only two visits, which had advanced from "supervised" to "loosely supervised" in mid-May 2024. The Agency hesitated to allow unsupervised visits because of concerns that Mother was continuing

her relationship with Father. In the wake of a June 2024 meeting with Mother and Father, who stated they understood that Father could not be present when the children were visiting, the Agency planned to begin unsupervised visits.

At the status conference, the court ordered that its prior orders were to remain in effect.

D    *August 2024 through January 2025 – Reports for Six-Month Review*

In advance of a six-month status review regarding Minor and T.M., scheduled for October 7, 2024, the Agency prepared a report recommending the termination of reunification services and the setting of a section 366.26 hearing as to both children. The Agency reported that Mother had complied with some aspects of her case plan. Mother's individual therapist reported that Mother met with him as scheduled and fully engaged in their sessions, and Mother had completed a parenting education class. But the Agency could not determine whether Mother was participating in required weekly domestic violence sessions, because although Mother had been requested more than once to obtain a progress report or allow the instructor to talk with the Agency, Mother had not done so. And Mother had missed numerous family therapy sessions and did not answer phone calls from the therapist, who tried to initiate weekly phone calls to keep Mother informed of concerns about T.M.'s behavior, including T.M. making statements like, "I'm going to beat up [Father], I want to shoot him and I don't like him."

The family therapist believed that Mother did not understand the gravity of the situation and failed to acknowledge what brought her family to the Agency's attention. The children's caregivers reported that T.M. was increasingly mentioning Father, and saying he cannot wait to see him so that he could fight and shoot him. In addition, the caregivers reported that T.M.

7

was engaging in new and aggressive behaviors toward Minor, waiting until no one is in sight before trying to pinch Minor or lie on his face. The Agency believed T.M.'s behavior stemmed from domestic violence he witnessed, but Mother appeared to believe that T.M.'s behavior was related to the Agency's involvement and that his behaviors would not continue in her care.

Mother's visits with Minor and T.M., which had progressed from supervised to unsupervised in mid-July 2024, were changed back to supervised visits in late July 2024, after T.M. returned from a visit with a first degree burn on his cheek. T.M. had run into a hot blow dryer during the visit, at a time when Mother was outside and had left the children inside with some members of her family. In August Mother missed three of seven scheduled visits, and in September she missed five of six scheduled visits. When visits occurred, Mother was engaged and affectionate.

The Agency assessed that although Mother loved her children she had not acknowledged the reasons for the Agency's involvement with the family; to the contrary, she stated there was never any domestic violence in the home. The Agency did not see any changes in Mother's behavior or evidence that she had learned new skills that would keep the children safe in her care.

At the October 2024 hearing, the court set a contested six-month review hearing for November 18, 2024.

In a memorandum prepared for the court on November 14, 2024, the Agency reported that Mother and Father met with a social worker at the Agency in October 2024. When Father told the social worker that he and Mother planned to be together, the social worker stated that the Agency was concerned that Father had not addressed the reasons the case was opened or engaged in a case plan. Father and Mother said that the allegations in the petition were "made up."

8

The Agency also reported that Mother's non-minor dependency had been terminated in October 2024 because Mother failed to maintain eligibility. Mother had often failed to meet with her social worker; had not participated in services or attended a GED program even though she told her social worker that she was doing so; and had chosen to leave a transitional housing program, so she was not in approved housing. As of November 12, 2024, Mother was staying with Father.

With respect to Mother's engagement in services, the Agency reported that Mother had completed two sessions of a domestic violence course and was estimated to complete the course in early December. The Agency reported Mother missed an October 25, 2024 family therapy visit with Minor and T.M. for which the children had been transported to the visit site. The therapist reported that family sessions were inconsistent, because Mother cancelled at the last minute or failed to confirm. The visit supervisor and family therapist expressed concerns about T.M.'s increasingly aggressive behavior toward Minor, and the visit supervisor said Mother found it difficult to manage T.M.'s behaviors.

At the November 18, 2024 hearing, the court noted that its tentative ruling was to grant the Agency's recommendation to terminate services and set a section 366.26 hearing. The court continued the matter for a contested six-month review hearing in January 2025.

At the January 2025 continued hearing, the court ordered that Father was not to be present at any visitation and that visits were limited to therapeutic visits, at a minimum of one hour, once per week. The court continued the hearing to February 10, 2025 for a combined six-month and 12-month contested review.

E.      *February 10, 2025 – Contested Six- and 12-Month Review Hearing*

In an update memorandum prepared on February 4, 2025, the Agency reported that Mother had missed four consecutive domestic violence classes in January 2025. The family therapist reported that she had reached out to Mother several times to suggest speaking before the therapeutic visits but Mother failed to respond. The therapist reported that visits had been inconsistent because of Mother's cancellations.

At the February 10, 2025 hearing, Minor's counsel, who also represented T.M., supported the Agency's recommendation to terminate reunification services as to Minor and T.M. and set a section 366.26 hearing. Mother objected to the recommendation, stating through her counsel that she was "basically in compliance" with her case plan, that she wanted to reunify with her children, and that she did not understand why she and Father could not be a family.

The court stated that the evidence showed that Mother "lacks an understanding as to why her continued relationship with [Father] is so problematic as it relates to her ability to safely parent her children" and that Mother "doesn't actually show up to all of her visits." The court observed that the evidence in the record did not support findings that Mother consistently and regularly contacted and visited her children, made significant progress in resolving the problems that led to the removal, and demonstrated the capacity and ability to complete the objectives of her treatment plan and provide for the children's safety, protection, physical and emotional health, and special needs. The court found that the extent of Mother's progress toward alleviating the causes that led to the placement of the children was "partial."

The court found by clear and convincing evidence that the Agency offered reasonable services to Mother and that the return of the Minor and T.M. to Mother's custody created a substantial risk of detriment to their safety, protection, and physical and emotional well-being. The court terminated family reunification services and set a section 366.26 hearing for June 2, 2025.

Mother timely filed a petition for extraordinary relief as to Minor.

## DISCUSSION

A.    *Applicable Law and Standard of Review*

Courts recognize that "providing children expeditious resolutions is a core concern of the entire dependency scheme," and that is "doubly true for the very young." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4 (*Tonya M.*).) As a general matter, when a child under the age of three is removed from the parent's physical custody, court-ordered reunification services are provided for six months from the time of the dispositional hearing, but no longer than 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(B).) However, if the child is not returned to the parent's custody at the 12-month mark, reunification services may be provided for an additional six months, up to a total of 18 months, but only if the juvenile court "finds that there is a substantial probability that the child will be returned to the physical custody of their parent . . . and safely maintained in the home within" 18 months of the date the child was taken from the parent's physical custody. (§ 366.21, subd. (g)(1).)

To find a "substantial probability" of return, the court must find that the parent "consistently and regularly contacted and visited with the child"; "made significant progress in resolving problems that led to the child's removal from the home"; and "demonstrated the capacity and ability both to

11

complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1); see also *Tonya M.*, *supra*, 42 Cal.4th at p. 845 [discussing the dependency scheme for children under age three].) In determining whether there is a substantial probability of return, courts do not look for perfection, instead they consider whether a parent has demonstrated the progress necessary for reunification within the relevant time period. (See *A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1062 [although perfection is not the standard, "a demonstrated lack of progress necessary for reunification . . . is absolutely relevant when the ultimate goal is expeditious resolution for the child"].)

We review the juvenile court's factual findings for substantial evidence, "resolv[ing] all conflicts in favor of the court's determinations, and indulg[ing] all legitimate inferences to uphold its findings." (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)

B   *Analysis*

In terminating Mother's reunification services, the juvenile court implicitly found at least one of the following:  that Mother did not consistently and regularly visit with Minor; that Mother did not make significant progress in resolving the problems that led to Minor's removal from her custody; or that Mother did not demonstrate the capacity and ability to complete the objectives of her treatment plan and provide for Minor's safety and protection.  (§ 366.21, subd. (g)(1).)  From our review of the record, we conclude that substantial evidence supports all three findings.

We begin with visitation.  There is no dispute that Mother's visits with Minor went well when they occurred, and that Mother's visits were consistent in the early part of the proceeding.  But Mother missed eight visits in August

12

and September, and at least one visit in October. And as late as February 4, 2025, the family therapist reported that Mother's visits were inconsistent. This is substantial evidence to support a finding that Mother did not consistently and regularly visit with Minor. (§ 366.21, subd. (g)(1)(A).)

Substantial evidence likewise supports the finding that Mother did not make significant progress in resolving the domestic violence issues that led to Minor's removal from her custody. (§ 366.21, subd. (g)(1)(B).) Mother was inconsistent in participating in the domestic violence classes that were included in her case plan. Mother completed a four-hour online domestic violence class in December 2023, but her attendance in required weekly domestic violence classes was inconsistent. As of July 2024, she was apparently attending weekly, but the Agency was unable to confirm that she attended in August and September and the record suggests she did not attend any classes in October. Although Mother completed two sessions of an on-line five-week domestic violence class in November 2024, there is no evidence that she completed the program. In January 2025 she missed four consecutive sessions of a program in which she was enrolled. More important than evidence of Mother's inconsistency in participating in her case plan is evidence from Mother's words and actions that she did not believe or understand that domestic violence affected her and her children. Although Mother eventually obtained a protective order against Father, she failed to have it served. Even after Father tried to break into her home and twice vandalized her car in the spring of 2024, Mother insisted the August 2023 incident that led to Minor's dependency was a one-time incident that would not occur again. Later, and as recently as October 2024, Mother stated that no domestic violence had ever occurred. And although social workers repeatedly explained the consequences of Father's failure to engage in

13

services related to domestic violence, at the contested 12-month review hearing, Mother stated through counsel that she did not understand why she and Father could not be a family with Minor and T.M.

Mother's inconsistency in visitation, her inconsistency in complying with the domestic violence portion of her case plan, and her lack of progress in addressing the domestic violence issues that led to Minor's dependency, including her insistence on living with Father, who had not engaged in any domestic violence services, are substantial evidence that Mother had not "demonstrated the capacity and ability" either to "complete the objectives of [her] treatment plan" or "to provide for [Minor's] safety, protection, [and] physical and emotional well-being." (§ 366.21, subd. (g)(1)(C).)

In her petition, Mother emphasizes the progress she made in her case plan by consistently and actively participating in individual therapy, by completing a parenting course, by taking domestic violence classes, and by visiting with Minor. Essentially, Mother argues that her participation in her case plan is substantial evidence to support findings different from those made by the juvenile court, but that is not the issue before us: if substantial evidence supports the juvenile court's findings, we affirm, even if evidence may also exist that would support contrary findings. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Conceding that she lacks insight regarding domestic violence and that she does not adequately understand "domestic violence and its grip," Mother argues that she "simply needs additional time" and that her youth and her history as a dependent weigh in favor of providing her additional services. We recognize that Mother's youth and her history have presented challenges for her to overcome, and we do not minimize the nature or extent of those challenges. But the extension of reunification services to 18 months requires

14

the juvenile court to find a substantial probability that Minor would be returned to Mother's physical custody within the extended time period. In Minor's case, substantial evidence supports the juvenile court's finding that there was no such substantial probability.

## DISPOSITION

Mother's petition for extraordinary writ is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.450(a), 8.490(b)(2)(A).)

<br>

_____
Miller, J.

WE CONCUR:

_____
Richman, Acting P. J.

_____
Desautels, J.

A172451, *Alana M. v. Superior Court*

15