Filed 10/2/25 In re B.P. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.P., A Person Coming Under the Juvenile Court Law. | B340153 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 23CCJP03286B) |
| Plaintiff and Respondent, | |
| v. | |
| F.G., | |
| Defendant and Appellant. | |
| F.G., | B347213 |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al., | |
| Real Parties in Interest. | |

APPEAL from an order of the Superior Court of Los Angeles County. Mary E. Kelly, Judge. Affirmed.

ORIGINAL PROCEEDING. Petition for extraordinary writ. (Cal. Rules of Court, rule 8.452.) Sumako McCallum, Judge. Petition denied.

Heather Tesdahl, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel for Plaintiff, Respondent and Real Party in Interest.

Los Angeles Dependency Lawyers; Law Office of Jolene Metzger, Dominika Campbell and Jason Steinberg for Petitioner.

No appearance for Respondent the Superior Court of Los Angeles County.

Children's Law Center of California, Kristin Hallak and Natalie Young, for Minor as Real Party in Interest.

_____

Appellant F.G. (Father), challenges the juvenile court's finding made at the six-month review hearing pursuant to Welfare and Institutions Code section 366.21, subdivision (e),[1] that Los Angeles County Department of Children and Family Services (DCFS) provided Father with reasonable reunification services as to his infant son B.P., also known as R.P. (born Sept. 2023).[2]

Father also filed a petition for extraordinary review (writ) challenging the juvenile court's findings and order, issued at an 18-month review hearing held pursuant to section 366.22, that DCFS provided reasonable reunification services and terminating those services. Father contends the record lacks sufficient evidence to

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    In an earlier appeal, R.P.'s mother N.P. (who is not a party to the instant actions) challenged jurisdictional findings and dispositional order removing R.P. from her care. We affirmed those findings and order. (*In re V.P.* (Jan. 30, 2025, B334901) [nonpub. opn.] (*V.P.*).)

support the court's findings that (1) returning R.P. to father created a substantial risk of detriment to the child, and (2) DCFS provided reasonable reunification services. On August 26, 2025, this court issued an order notifying the parties of its intent to consider these matters together. Concluding the challenged orders have sufficient evidentiary support, we affirm as to the appeal and deny the writ.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties are familiar with the background of the case, so we will not fully restate those details here. (See *People v. Garcia* (2002) 97 Cal.App.4th 847, 851 [unpublished opinion reviewing correctness of a trial court's decision "does not merit extensive factual or legal statement"].) We discuss the background facts and procedural history as needed to provide context for and resolve the issues presented.

Newborn R.P. and his toddler half brother, V.P.[3] were removed from their mother, N.P. (mother), after DCFS received an emergency referral that toxicology screens for mother and R.P. revealed the presence of methamphetamine, amphetamine and marijuana. (*V.P., supra,* B334901.) Mother admitted having used those substances during her pregnancy, as recently as a few days before R.P.'s birth. (*Ibid.*) Together with his half brother, R.P. was placed in the care of his Maternal Grandmother, where he remains.

In the section 300 petition filed on September 27, 2023, jurisdiction as to Father was premised largely on allegations he knew about mother's substance abuse but failed to take action to protect R.P. and had a history of substance abuse and an extensive criminal history related primarily to drug-related crimes. (§ 300,

---

[3] V.P. has no biological connection to Father and is not a subject of this appeal or writ.

subd. (b).) At the detention hearing, R.P. was removed from parental care and Father was given monitored visitation.

At the jurisdictional/dispositional hearing on November 27, 2023, the juvenile court sustained the petition. The court rejected Father's assertions that he could not have protected his unborn child. Rather, the evidence showed Father permitted mother to live in his home for a time before she gave birth. He knew mother was using drugs and did not approve but took no action. Instead, to avoid conflict, Father "just left when [mother] used." The court also rejected the assertion that Father's extensive history of drug use, recent relapse with methamphetamine and ongoing use of marijuana posed no risk of serious harm to R.P. The court ordered family reunification services (FRS) to include a parenting class for Father (who was admittedly wholly unprepared to care for a child), a full drug and alcohol program and aftercare, random weekly on-demand drug testing and individual counseling to address case issues and child protection. Father was given monitored visitation.

At a hearing on May 24, 2024, DCFS reported Father had been incarcerated since early February 2024 on drug charges at the Pitchess Detention Center in California and sentenced to four years in prison. Father told a DCFS children's social worker (CSW) he expected to remain in custody for about 18 months. He was trying to enroll in a drug treatment program and parenting classes in prison. Father had not participated in individual counseling but was trying to enroll in a program that included group and individual counseling. Father had had trouble having phone visits with R.P. and requested to see R.P. in person. A paternal relative had agreed to bring the child for biweekly visits at his place of incarceration, beginning May 19, 2024. DCFS was ordered to assist Father to enroll in services available at his place of incarceration and to assess the possibility of virtual visitation while Father remained incarcerated and in-person visits once the baby was fully vaccinated. DCFS reported that R.P. was well-cared for by

4

Maternal Grandmother, and his symptoms of withdrawal from prenatal drug exposure had abated.

## I.    The Six-month Review Hearing

After several continuances, the six-month review hearing was conducted on August 16, 2024. During the intervening period, Father presented to the juvenile court DCFS's "Title XX's" to support his assertion that DCFS failed to provide him with reasonable services. A "Title XX" is a "delivered service log" of all contacts, services and visits by DCFS.

The matter proceeded in Father's absence, and the Title XX's were admitted into evidence. By this time, Father had been transferred to a prison in Corcoran, California. DCFS argued Father's projected release would be beyond the time for reunification, his visitation had been inconsistent, and no additional services or programs were available to Father at his current place of incarceration.

Counsel for R.P. argued that, even after Father reached out in April 2024, DCFS had failed to make reasonable efforts to communicate with him and made no reasonable effort either to investigate what programs were available to Father while incarcerated or to assist him to enroll in such programs. Father's counsel argued the Title XX's demonstrated DCFS failed to provide him with any FRS, let alone reasonable services. Father asserted DCFS failed to reach out to him for five consecutive months, failed to facilitate visits with R.P., and failed to investigate any programs available to him while incarcerated.

The juvenile court found Father had made a substantial effort to comply with the case plan. The court also found that, although DCFS made reasonable but ineffective efforts to provide services to Father, its shortcomings were "harmless" as "[n]o one [was] able to identify any programs that were available to Father." The court continued Father's FRS for six months. DCFS was ordered to contact Father and facilitate visitation. The court

5

calendared a section 366.21, subdivision (f) review hearing for February 14, 2025. Father filed the instant appeal.

Father was not present at the February 14, 2025, 12-month review hearing. R.P.'s counsel requested Father's FRS be continued because Father had made efforts to obtain services and may have completed a parenting program, and any failure by Father to participate in services or to contact DCFS was "out of his control." Counsel observed that, according to the Title XX's, DCFS's last documented attempts to contact Father's prison facility or Father had been in October 2024, and January 2025. R.P.'s counsel also pointed out Father's transfer to Corcoran impeded his ability to engage in visitation.

Father's counsel argued DCFS failed to demonstrate it had provided or assisted Father with reasonable services. Specifically, counsel argued DCFS failed to present sufficient evidence of Father's calls to the agency, mailed him a letter requiring his response just three weeks before the February 2025 hearing, which was an insufficient time to obtain a reasonable response from an incarcerated parent, and ignored his requests to contact two individuals at his facility to help him identify and access programs, or to identify programs he had already completed. Father's counsel also noted Father may have completed services about which the court was not yet aware, because a "Substance Abuse Treatment" program Father completed focused on treating substance dependency. Father was on waiting lists for both AA and Criminal Gangs Anonymous meetings. Attorneys for Father and R.P. requested the juvenile court find that, based on Father's efforts to comply with his case plan, there was a substantial probability R.P. could be returned to Father's custody within 18 months. Father requested the court find DCFS failed to make reasonable efforts to assist reunification, and continue his FRS.

The juvenile court acknowledged that, although "more could have been done" by DCFS, the agency made reasonable efforts to return R.P. to a safe home environment, by communicating with

6

Father and making efforts to facilitate video visitation. The court observed there did not appear to be any additional programs or resources available to Father at his place of incarceration in which DCFS could have helped him to enroll. The court extended FRS, observing Father might be able to make an "appropriate" plan by the time of the 18-month review. DCFS was ordered to verify Father's completion of a parenting program and participation in any other programs. The court found Father had "partial[ly] compli[ed]" with his case plan and set a section 366.22 review hearing for March 26, 2025.[4]

## II. The 18-month Review Hearing

In its status review report for the 18-month review hearing, DCFS reported it had contacted Father's last known prison in Corcoran California in February 2025 to verify any programs in which Father had participated. Prison staff told DCFS that Father left Corcoran in November 2024 and his current place of incarceration was unknown. On February 26, 2025, Father's girlfriend contacted DCFS to report Father was now incarcerated in Florida "on a federal drug case." Father had no pending court date, was unable to make free calls or send or receive letters, and no one knew how long he would remain incarcerated. DCFS set up a three-way call with Father and his girlfriend which, for unexplained reasons, never took place.

DCFS informed the juvenile court that it had contacted the prison in Corcoran several times but was unable to reach Father's counselor or obtain information about any programs Father completed at Corcoran. DCFS had had no contact with Father since November 2024 and was unable to verify his claim that he

---

[4] On February 19, 2025, Father filed a second appeal (case No. B344419) challenging orders made at the 12-month review hearing. Parts of our factual recitation are drawn from the record filed in that appeal.

completed a "Parenting While Incarcerated" program. Father's attorney had given DCFS an incorrect password to access the program to verify completion, and Father was unable to obtain the correct password. DCFS reported Father had no visitation with R.P. since October 2024 and had been unable to develop any meaningful connection with R.P. DCFS also reported that, as of November 2024, Father had not participated in individual counseling required by his case plan, and DCFS was unaware whether he obtained such counseling thereafter. DCFS recommended Father's FRS be terminated.

In a last-minute information, DCFS reported having engaged in a three-way call with Father and his girlfriend on March 20, 2025. Father was in federal custody in Florida, lacked access to free phone calls and was unable to send or receive letters. Father told the CSW there were no programs available at his facility to enable him to comply with his case plan, and he did not know how long he would be there. By this time, DCFS had been able to log into Father's Corcoran account which reflected he had completed a six-hour "Parenting While Incarcerated" program in mid-March 2025 and an eight-hour Substance Use Recovery program in early April 2025, among others. The 18-month review hearing, originally scheduled for April 25, 2025, was continued several times and ultimately conducted on June 26, 2025.

In a last-minute information filed June 24, 2025, DCFS reported Father remained incarcerated in Florida with no anticipated date for release. At the hearing on June 26, R.P.'s counsel joined DCFS in recommending Father's FRS be terminated due to his ongoing federal incarceration with no end date in sight, and his inability to access services or arrange visitation.

At the 18-month review hearing, Father's counsel requested R.P. be returned to Father's custody. Counsel argued Father had made a good faith effort to comply with his case plan and should be permitted to determine whether there was an appropriate interim placement for R.P. pending his release, possibly with his girlfriend.

Counsel argued DCFS had presented insufficient evidence for the court to find that return of R.P. to Father's care posed a substantial risk of detriment, given that Father had completed many hours of educational programming, including an eight-hour Substance Use Recovery course and a six-hour Parenting While Incarcerated program. Counsel argued Father's incarceration prevented him from fully complying with his case plan and it was unreasonable to terminate FRS given that his inability to complete required programs was beyond his control.

Alternatively, Father's counsel requested the juvenile court extend Father's FRS six months in light of DCFS's failure to present sufficient evidence that the agency had made reasonable efforts to assist Father to complete his case plan or to provide reasonable alternatives for programs unavailable in prison. Counsel requested Father be permitted additional time to determine whether an appropriate plan for R.P.'s care could be arranged pending his release.

In response, DCFS argued that, despite the difficulties presented by Father's incarceration, it maintained contact with Father as well as possible given his transfers among various facilities in California and Florida. DCFS acknowledged Father had made an effort to do what he could. Nevertheless, after more than 18 months, Father had yet to comply with the court's orders. DCFS argued there were no further reasonable services it could provide to Father under the circumstances, and it would be inappropriate to return R.P. to Father's custody.

The juvenile court acknowledged Father made efforts to participate in programs while incarcerated but was unable to complete his case plan. Importantly, the sustained allegations related to Father's substance abuse, and there was no evidence Father had undergone the required testing or participated in a sufficient substance abuse program. The court found that, under the circumstances, DCFS made reasonable efforts to maintain communication with Father and the facilities in which he was

9

housed to determine what services were available to him and to facilitate his compliance with his case plan. The court found return of R.P. to Father's custody would create a substantial risk of detriment to the child, and it was in R.P.'s best interest to schedule a section 366.26 to determine a permanent plan and terminated FRS. On August 18, 2025, father filed the instant writ.[5]

## DISCUSSION

### I.    General Principles and the Standard of Review

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.] Such services may, depending on the case, include . . . counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted (*Michael G.*).) Under section 361.5, subdivision (a)(1)(B), "[p]arents of children under three [years of age] are presumptively eligible for at least six months of reunification services." (*Michael G.,* at p. 625.) "Reunification services are ordinarily provided for a maximum of 18 months after a child has been removed from parental custody." (*Ibid.*) During the reunification stage, the juvenile court must hold periodic review hearings—typically at six-month intervals—at which the court evaluates, among other things, the adequacy of reunification services offered or provided, the extent of a parent's progress and appropriate next steps. (*Ibid.*; see also § 366.21.)

At the six-month status review hearing, the juvenile court evaluates whether DCFS has proven, "by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or

---

[5]     On September 5, 2025, counsel for real party in interest, R.P., submitted a letter joining DCFS's arguments in opposition to the writ.

10

physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) Where, as here, the child is under age three, and the court finds the child cannot safely be returned to parental custody, the court must decide whether to continue reunification services an additional six months, or to set the matter for a permanency planning hearing under section 366.26. (See §§ 361.5, subd. (a)(1)(B), 366.21, subd. (g).) If the court finds there is a substantial probability the child will be returned to the physical custody of their parent and safely maintained in the home within the extended period of time or that the parent was not provided reasonable services, the court may "[c]ontinue the case for up to 6 months for a permanency planning review hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken from the physical custody of their parent . . . ." (§ 366.21, subd. (g)(1).)

We review the juvenile court's finding that reasonable services were provided to determine whether any substantial evidence, contradicted or not, supports that finding, drawing all legitimate inferences in favor of the finding. (*In re Melinda K.* (2004) 116 Cal.App.4th 1147, 1158 (*Melinda K.*), abrogated on another ground by *In re S.B.* (2009) 46 Cal.4th 529, 537 (*S.B.*).) We do not pass on credibility determinations, nor attempt to resolve conflicts in or weigh the evidence. "[W]e draw all reasonable inferences in support of the [juvenile court's] findings, view[ing] the record in favor of the . . . court's order and affirm [that] order even if other evidence supports a contrary finding." (*In re James R.* (2009) 176 Cal.App.4th 129, 135, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 629.) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Melinda K.*, at p. 1159.) The adequacy of reunification plans and reasonableness of DCFS's efforts to provide suitable services must be judged according to the unique

11

circumstances of the case. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011; *Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554.)

## II.  Appeal From the Six-month Review Hearing

After several continuances the six-month review hearing was conducted in August 2024, eight months after R.P. was removed from parental custody and the period for FRS began. Father contends the juvenile court erred when it found DCFS provided him with reasonable services during the initial reunification period.[6]

Newborn R.P. was taken into protective custody and placed with Maternal Grandmother in September 2023. Father acknowledged he was a frequent user of marijuana and had

---

[6]  Relying on *Melinda K.*, DCFS argues an appeal from a finding at the six-month review hearing that reasonable services were provided is not directly appealable, because Father was not aggrieved by the order. (*Melinda K., supra,* 116 Cal.App.4th at p. 1150.) *Melinda K.* acknowledged a reasonable services finding "may have negative consequences at subsequent hearings." (*Ibid.*) The *Melinda K.* court concluded that such a finding could be reviewed by writ petition but exercised its discretion to treat the matter as an appeal. (*Id.* at pp. 1150, 1156–1157.)

Father maintains he may appeal the finding that DCFS provided reasonable services because the finding, effectively put him at a procedural disadvantage and may adversely have affected his interest in reunification. We agree. *Melinda K.'*s reasoning on this point was called into question by *S.B.*, *supra,* 46 Cal.4th 529. In *S.B.*, a mother challenged the juvenile court's finding—made in an order after a section 366.26 hearing—that her children were probably adoptable. (*S.B.*, at p. 534.) The appellate court dismissed the mother's appeal, "reasoning that she was challenging only the *finding* that her children were probably adoptable." (*Ibid.*) The high court held this to be error, explaining that "review of findings is normally obtained by appeal from the ensuing . . . order." (*Ibid.*) The same rationale applies to permit appellate review of a reasonable services finding.

recently used methamphetamine. Despite this admission, Father refused to participate in drug testing until ordered to do so by the juvenile court. Father had inconsistent visits with R.P. at Maternal Grandmother's home after November 27, 2023, and did not engage with his son during visits. Maternal Grandmother suspected father had continued to abuse drugs, because he "act[ed] weird[,] almost falling asleep" during visits. After the adjudication hearing, Father maintained only minimal contact with the CSW and did not participate in a drug and alcohol program. The CSW signed him up for drug testing in early January 2024.

By February 2024, Father was incarcerated at Pitchess on drug charges. He did not apprise DCFS of his whereabouts until April 2024, one month before the initially scheduled six-month review hearing. At that point, he informed DCFS he had been sentenced to four years in prison. Father said he was trying to enroll in a drug treatment and counseling program, and a parenting program. During his incarceration, Father had a few telephonic visits with R.P. However, Maternal Grandmother told Father to stop calling because he always spoke about mother and said she would accept his calls if he confined them to speaking about R.P.

Father argued DCFS never reached out to him after his contact in April 2024, did not facilitate visitation, and did not communicate with his place of incarceration to see what programs were available to him or help him enroll in programs. Accordingly, he argued DCFS had failed to provide reasonable services to facilitate his reunification with R.P. The juvenile court noted that, although DCFS's efforts were not "as robust as [it] would have liked," the services DCFS nevertheless provided were reasonable but "ineffective" services. The court found DCFS's efforts harmless as no one had identified any programs that may have been available to Father. The court also found Father's progress in alleviating or mitigating the problems that had necessitated court intervention was "unsubstantial." The court exercised its discretion

13

to continue Father's FRS, ordered DCFS to establish a visitation schedule and scheduled a 12-month review hearing for February 2025.

We conclude that, under the circumstances of this case and viewing the evidence in the light most favorable to the prevailing party, the record contains sufficient evidence to support the juvenile court's finding that DCFS provided minimally reasonable services during the initial reunification period, and that its failings were harmless. From the time R.P. was initially detained, Father understood his and Mother's substance abuse were the principal cause of his son's detention. Despite that understanding and his own admission of recent methamphetamine use and ongoing substance use, Father refused to participate in drug testing until ordered to do so. Even after that order was issued, Father failed to test. Further, despite a court order to keep DCFS apprised of his current address and phone number, Father failed to do so until seven months after R.P.'s detention, and just one month shy of the scheduled initial review hearing. It would be unreasonable to permit Father to remain idle and place the blame entirely on DCFS for its ineffective provision of FRS. Father was aware he had a very limited amount of time to demonstrate his commitment to his infant son, make a meaningful effort to obtain parenting skills and address the problems that gave rise to this action. Certainly, DCFS should have been more active in facilitating Father's compliance with his case plan. But Father himself, who had every incentive to do whatever he could within the constraints of his incarceration to justify reunification with R.P., made little effort to do so.

Father is correct that reasonable visitation is an essential component of any reunification plan, necessary to facilitate a meaningful parent-child relationship. We do not condone DCFS's failure to facilitate Father's visitation during the initial reunification period. Nevertheless, Father was incarcerated for

14

much of the reunification period. R.P., who was only a few months old and only saw or was contacted by Father a few times and was unlikely to have been able to begin to develop any meaningful relationship with Father. We conclude the juvenile court's decision to extend FRS and admonish DCFS to facilitate visitation and assist Father's compliance with his case plan within the constraints of his incarceration, was reasonable under the circumstances presented here. Accordingly, we reject Father's contention of error.

## III. The Juvenile Court Did Not Err in Finding That Return of R.P. to Father's Custody Would Be Detrimental to the Child and that No Extension of FRS Was Justified

In his writ, Father challenges the juvenile court's decision, at the 18-month review hearing, to terminate FRS and set the matter for a permanency planning hearing. He maintains the record lacks sufficient evidence to support the finding that there was a substantial risk of detriment if R.P. were released to him with an appropriate plan and continues to argue that DCFS failed to provide him with reasonable FRS while incarcerated. Father seeks an order releasing R.P. to his custody with an appropriate plan of care pending his release. Alternatively, Father asks this court to find DCFS failed to provide him with reasonable services and order he be provided an additional six months of FRS. We reject both contentions.

### A. Controlling Legal Principles and the Standard of Review

Here, the 18-month permanency review hearing was not held until 21 months after R.P.'s detention. The statute governing this hearing states, in part, that, "[a]fter considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to

15

their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. [DCFS] shall have the burden of establishing that detriment." (§ 366.22, subd. (a)(1).)

If a child is not returned to his parent at the 18-month hearing, the juvenile court must terminate FRS and schedule a permanency planning hearing pursuant to section 366.26. (§ 366.22, subd. (a).) In making its determination in a case involving an incarcerated parent, the court must consider the parent's efforts or progress and the extent to which the parent availed himself of available services, taking into account any barriers posed to the incarcerated parent's access to court-mandated services or programs, and the parent's ability to maintain contact with the child. (§ 366.22, subd. (a)(1); *V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 527 (*V.C.*).) The court evaluates whether the parent has made sufficient progress in resolving the issues that led to the child's removal. (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1062 (*A.H.*).) Although perfection is not required, a demonstration of progress is pivotal, taking into account the length of incarceration and severity of the problems that led to court intervention. " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Melinda K., supra*, 116 Cal.App.4th at p. 1159.) Even compliance with a case plan does not guarantee a child's return. (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143; *In re Joseph B.* (1996) 42 Cal.App.4th 890, 899–901.) Although evidence of a parent's compliance is relevant, it is neither the court's only concern nor is it dispositive. (*Joseph B.*, at pp. 899–901.) The reasons justifying continued removal need not be the same as the initial detriment. If return of the child would create a substantial risk of detriment, the child's "placement must continue regardless of whether that detriment

mirrors the harm which initially required removing the child from parental custody." (*Id.* at p. 900.)

Viewing the record in the light most favorable to the juvenile court's findings and resolving conflicts in favor of the prevailing party, our job is to determine whether substantial evidence supports the juvenile court's order. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.) As petitioner, it is Father's burden to show there is insufficiently substantial evidence to support the court's determination. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

## B. Application

The 18-month permanency review hearing in this case was not conducted until 21 months after newborn R.P.'s detention. Contrasting *A.H., supra*, 182 Cal.App.4th at page 1056 and *V.C., supra*, 188 Cal.App.4th at page 525, in which the incarcerated fathers had access to court-ordered programs, but chose not to participate, Father maintains his completion of a six-hour parenting program, and an eight-hour substance abuse program,[7] demonstrates his commitment to taking responsibility for the problems that led to juvenile court intervention. During his incarceration, Father had several video visits with R.P., but no contact at all between October 2024 and June 2025. Father argues the juvenile court was required to return R.P. to his legal custody to arrange for appropriate care pending his release and demonstration of the ability safely to care for R.P. He is mistaken.

Father is correct that his incarceration, considered alone, is not necessarily detrimental to a child and it was DCFS's obligation to show return of R.P. to his custody would be detrimental. (See *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077 [addressing the

---

[7] Father was unable to complete the individual counseling and drug testing components of his case plan, neither of which was available to him in any facility in which he was incarcerated.

17

detriment standard that must be shown to prevent release to an incarcerated parent at status review hearings in the context of jurisdictional and dispositional matters]; see also § 366.22, subd. (a)(1).) He maintains that, because he completed the programs he could, the juvenile court was obligated to return R.P. and permit him to make arrangements for the child's care during his incarceration, but DCFS failed to explore viable options for R.P.'s temporary placement. Specifically, Father points to DCFS's failure to investigate whether paternal relatives or his girlfriend would be appropriate placements for R.P. pending Father's release.

Here, the 18-month review hearing was continued three times until June 2025. At a hearing in February 2025, the juvenile court observed that, by the time of the 18-month review, Father "[could] be in a place to make an appropriate plan . . . ."[8] However, it was not until late June 2025 that Father's counsel mentioned Father's girlfriend as a possible appropriate interim placement. The record contains no evidence of the length or nature of Father's relationship with his girlfriend, whose existence only became known in February 2025, nor that such a possibility was posed during the CSW's call with Father and his girlfriend. Father never identified his girlfriend or anyone as a potential interim caretaker for R.P. before the June 2025 hearing, nor did he express a desire to move R.P. from his placement with Maternal Grandmother. Indeed, it was Father's attorney who first posed the possibility at the 18-month review hearing that Father's girlfriend might be an interim caretaker for R.P. The record contains no indication Father's girlfriend or anyone other than Maternal Grandmother

_____

[8]     Father was not present for this hearing. Presumably, his counsel communicated this information to him, as well as the short timeline for reunification. There is no indication Father ever made an effort to arrange a suitable placement for R.P., should the child be returned to his custody before his release.

expressed an interest in caring for the child. DCFS cannot be faulted for failing to investigate unknown alternative caretakers. Accordingly, there was no viable basis to justify the juvenile court releasing R.P. to Father's custody in the absence of an appropriate plan of care pending his release.

Father also argues the juvenile court should at least have extended FRS six months due to DCFS's ongoing failure to provide reasonable services and because his completion of the substance abuse and parenting programs available to him demonstrated his commitment to address the issues that gave rise to DCFS's intervention. Father notes after receiving transcripts showing the classes he had completed, DCFS failed to reach out to the service provider to ascertain whether those classes satisfied the requirements of his case plan,[9] and never spoke with him to evaluate what he had learned from those courses or gauge his insight into the issues that gave rise to this action.

An unfortunate series of events prevented DCFS from verifying Father's participation in prison programs or contacting Father in advance of the 18-month hearing. Having received an incorrect password from Father's attorney, DCFS was unable to access prison records to confirm Father's claim that he completed parenting and substance abuse programs, and Father was unable to reach his prior counselor to obtain the correct password. DCFS was unable to reach Father for months before the 18-month review hearing. An administrative or clerical error at Corcoran mistakenly indicated Father was incarcerated at Corcoran until at least November 2024, but prison officials were unaware of his current location. DCFS obtained contact information for Father's counselor at Corcoran to discuss programs Father completed but

_____

[9] Given the severity of the problem, it is unlikely the juvenile court would find that Father's completion of an eight-hour substance abuse class satisfied a case plan requiring that he complete a "[f]ull drug and alcohol program, with aftercare."

was never able to reach the counselor. Both times the CSW tried to call she received only a message indicating technical difficulties. Eventually, DCFS was able to log into Father's account and confirm his participation in a six-hour parenting course and an eight-hour substance abuse class. DCFS also learned Father had not been in contact with R.P. since October 2024. DCFS did not ascertain Father's location until his girlfriend contacted the agency in February 2025. A three-way call with Father, his girlfriend and the CSW was scheduled but never occurred. DCFS eventually spoke with Father who confirmed he was incarcerated in federal custody in Florida and had no idea when he would be released. DCFS made a good faith effort, but was hindered by its inability to verify programs Father had completed and the limits of Father's out-of-state federal incarceration. The fact that DCFS's efforts to obtain information about and to contact Father were unsuccessful did not render those efforts unreasonable.

Moreover, even if the juvenile court had found DCFS failed to provide reasonable services, it was under no obligation to extend FRS, delaying permanent placement for a child left in limbo for almost two years. As our Supreme Court recently explained, "while the dependency law does not categorically forbid courts from extending services past 18 months, neither does it require them to do so in every case in which they find reasonable services were not offered in the most recent review period. Rather, once a child has already been out of the parent's custody for 18 months, the law vests the juvenile court with responsibility for determining how to proceed after considering the circumstances of the case and the best interests of the child." (*Michael G., supra,* 14 Cal.5th at p. 627.)

Absent narrow exceptions not applicable here, where a child has been out of a parent's custody for 18 months and cannot safely be returned, the juvenile court is ordinarily obligated to proceed to schedule a permanency planning hearing under section 366.26.

20

(*Michael G., supra,* 14 Cal.5th at p. 627; see *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504 [identifying narrow exceptions]; see also § 366.22, subds. (a)(3), (b).) "In enacting dependency statutes, the Legislature sought to achieve a careful balance between family reunification on the one hand and permanency for the child on the other. [Citations.] Under this scheme, the balance tips towards permanency as the time since removal increases. [Citations.] . . . . [B]y establishing a presumptive maximum reunification period of 18 months and giving courts the discretion to extend services beyond that point in extraordinary circumstances, the statutory scheme allows courts to make case-specific determinations about how best to promote the interests of the child while protecting against the erroneous deprivation of parental rights." (*Michael G.*, at pp. 635–636.)

Under the circumstances of this case, the juvenile court correctly determined that extending FRS would be fruitless. Father had not maintained consistent and regular contact with R.P., had not made significant progress in resolving the issues that led to the court's intervention, had not demonstrated the capacity to complete the components of his case plan, had no expected date of release and never identified a potential interim placement pending his release, should R.P. be returned to his custody. (See *Michael G., supra*, 14 Cal.5th at p. 636.) Providing expeditious resolution for children is a core concern of dependency proceedings, and, although a parent's incarceration must be considered, the statutory provisions do not suggest an incarcerated parent should be excused from complying with a service plan. (*A.H., supra,* 182 Cal.App.4th at pp. 1060–1061.)

"[T]he Legislature has recognized that in some circumstances, it may be fruitless to provide additional reunification services." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 64.) In many cases, the provision of services has little likelihood of success and only serves to delay stability for the child. "This is

21

especially true when the parent will be incarcerated longer than the maximum time periods for reunification efforts. It is also frequently true when the parent is incarcerated in a facility that has no services sufficient to help the parent work toward reunification and there is no reasonable way to provide services to that parent. Indeed, to attempt services in such circumstances may be setting everyone up for failure, including the parent, agency, and child." (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1031, italics omitted.) " 'In such a case, the general rule favoring reunification services is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.' " (*Jesse W.,* at pp. 64–65.) Accordingly, we deny the petition.

## DISPOSITION

The August 16, 2024 order from which Father appeals is affirmed. The petition for extraordinary writ is denied.


RICHARDSON, J.

WE CONCUR:


LUI, P. J.


CHAVEZ, J.