Filed 4/9/26  In re L.R. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.R., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G065851 |
| Plaintiff and Respondent, | (Super. Ct. No. 24DP0146) |
| v. | O P I N I O N |
| K.C. et al. | |
| Defendants and Respondents; | |
| L.R., | |
| Appellant. | |

Appeal from an order of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Minor and for Appellant.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Respondent K.C.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Respondent L.R., Sr.

No appearance for Plaintiff and Respondent.

\*          \*          \*

L.R. (the child) appeals from the juvenile court's order at the 12-month review hearing extending reunification services for the child's mother K.C. (Mother) and father L.R., Sr. (Father) for an additional six months. (Welf. & Inst. Code, 366.21, subds. (f) & (g)(1).)[1] For the reasons we explain, substantial evidence supports the court's finding there was a substantial probability, within the meaning of section 366.21, subdivision (g)(1), the child would be returned to parental custody within the additional six-month time period. We therefore affirm.

FACTS AND PROCEDURAL HISTORY

I.

THE CHILD WELFARE PETITION

In January 2024, the Orange County Social Services Agency (the Agency) filed a child welfare petition on behalf of the child, who was then three years old, which was later amended by interlineation in March 2024 (the petition). The petition alleged the child came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) because the child suffered, or there was a substantial risk the child would suffer, serious physical harm or illness: (1) as a result of the failure or inability of the parents to supervise or protect the child adequately and (2) by the inability of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

the parents to provide regular care for the child due to their mental illness or substance abuse.

The petition alleged, on January 25, 2024, the child was admitted to the hospital for "a swollen neck/lymph node issue." Two days later, the child submitted to a urine drug screening test which tested positive for the presence of fentanyl. Mother reported she had "'no idea' how the child could have tested positive for fentanyl" and denied observing "any symptoms of fentanyl exposure." Mother reported she and the child had been at a laundromat the night before the child's hospitalization, which laundromat, according to the police, was known for "transient activity and drug use." The child was taken into protective custody and placed with a maternal relative.

The child had prior exposure to fentanyl in May 2022. After the parents and the child attended a swap meet "known to have controlled substance sales," the child became nonresponsive after ingesting fentanyl. Paramedics administered Narcan to the child upon their arrival at the scene.

Before that, in October 2021, oxycodone, hydrocodone, Xanax bars, Alprazolam, and buprenorphine were found inside a locked safe at the maternal grandparents' residence during a probation search of Father. Mother and Father were thereafter arrested.

The petition further alleged Mother had unresolved substance abuse problems involving heroin, marijuana, alcohol, Xanax, fentanyl, and methamphetamine. Mother started experimenting with drugs at 16 years old leading to her use of marijuana, alcohol, Xanax, and methamphetamine. While in jail at the age of 19 years, Mother used heroin; she later used heroin with Father. The maternal grandparents reported Mother used drugs during her pregnancy with the child but has been sober since having the child.

3

Mother reported her "'on and off'" use of heroin since 2018. She claimed the last time she used heroin, smoked marijuana, or used THC was in December 2023. She denied having a then-current substance abuse problem.

The petition alleged Father also had an unresolved substance abuse problem which involved his use of heroin, oxycodone, hydrocodone, Xanax bars, Alprazolam, and buprenorphine. Mother reported heroin was Father's drug of choice although she did not know if he was still using.

Father has multiple drug-related criminal charges and convictions. He has been arrested, charged, and/or convicted of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)), possession of a controlled substance (Health & Saf. Code, § 11350), and possession of a controlled substance without a prescription (Bus. & Prof. Code, § 4060).

The petition also alleged Mother has a history of mental health issues. She reported she experienced postpartum depression and attempted to commit suicide by jumping off a bridge, resulting in an overnight hospitalization. She reported the maternal grandmother's support and Mother's attendance at both "'Mommy and Me'" classes and church helped her to get through those issues. Mother denied receiving mental health treatment services in the past.

In addition, the petition alleged the parents "have not consistently met the child's developmental needs." After the child's prior pediatrician diagnosed the child with autism, following which the child received services from Regional Center of Orange County from 2022 to 2023, Mother changed pediatricians because she felt the child had been misdiagnosed. The child had not attended his early development program

since October 2023. Mother reported the child was verbal but "not sufficiently verbal to answer questions by the social worker."

## II.

### THE JURISDICTION AND DISPOSITION HEARINGS

At the jurisdiction hearing in March 2024, Mother and Father each pleaded nolo contendere to the allegations of the petition. The juvenile court found the allegations of the petition true by a preponderance of the evidence.

At the disposition hearing the following month, the juvenile court declared the child a dependent child of the court under section 360 subdivision (d). The court found, pursuant to section 361, subdivision (d), reasonable efforts had been made to "eliminate the need for removal of the child from his home" and further found vesting custody of the child "with the parents would be detrimental to the child." The court approved a case plan and a visitation plan for the parents. The parents' case plan included general counseling, parenting education, a 12-step program, substance abuse testing, and participation in an outpatient substance abuse program.

## III.

### SIX-MONTH REVIEW HEARING

By the time of the October 2024 six-month review hearing, the parents had completed some portions of the case plan; they completed a parenting class and participated in conjoint counseling. At the six-month review hearing, the Agency recommended the juvenile court continue reunification services and schedule a 12-month review hearing.

The juvenile court found, pursuant to section 366.21, subdivision (e) and by a preponderance of the evidence, "return of the child to [the] parents would create [a] substantial risk of detriment to the safety,

5

protection, or physical or emotional well-being of the child." The court found the extent of the parents' progress "toward alleviating or mitigating the causes necessitating placement [had] been minimal." The court ordered continued services for the parents and set the matter for a 12-month review hearing.

IV.

12-MONTH REVIEW HEARING

The 12-month review hearing took place over five days from May to July 2025. The juvenile court accepted into evidence the Agency's reports dated March 7, 2025, April 23, 2025, May 9, 2025, May 27, 2025, and June 23, 2025, as well as certain documentary evidence proffered by Mother at the hearing. In addition, the assigned social worker, Father, Mother, and Mother's behavioral health therapist and case manager Christine Allard each testified at the hearing.

*A. Summary of Relevant Evidence*

In its March 7, 2025 report preceding the 12-month review hearing, the Agency recommended the juvenile court order services for the parents continued for an additional six months and set the matter for an 18-month review hearing. That recommendation was supported by Mother's progress with respect to her case plan. The assigned social worker and author of that report testified Mother was participating in counseling; her therapist reported Mother was doing well in counseling and stated he did not think it was appropriate for her to be required to submit to a psychiatric evaluation at that time. Mother was taking prescribed psychotropic medication and had submitted to "medicated-assisted treatment" for her addiction issues. She completed a parenting program and attended five 12-step meetings so far.

6

Mother consistently and regularly visited the child, Mother came prepared for the visits, and the visits had gone well.

In addition, Mother had a stable residence and the support of her family. The social worker reported Mother had cooperated with the Agency, particularly since December 2024, when she "really started engaging in her case plan services."

In the March 7, 2025 report, the social worker stated Mother completed a medical detoxification program at College Hospital and spent more than 30 days at Pheonix House. She had moved in with the maternal grandparents and ended her romantic relationship with Father. She was participating in drug patch testing services as well as in a substance abuse outpatient program.

In the Agency's April 23, 2025 addendum report, the Agency changed its recommendation to recommend the termination of reunification services for the parents. In that report, the social worker stated that although Mother claimed a sobriety date of December 12, 2024, Mother's drug patch test results continued to yield positive results for methamphetamine and fentanyl. However, the social worker acknowledged Allard's observations, who noted Mother's decreasing levels of illicit substances, reflected in test results from March 6, 2025 to April 7, 2025, indicated Mother was not actively using such.

The Agency's May 9, 2025 addendum report included Mother's outpatient substance abuse program physician's explanation for Mother's positive fentanyl test results. The physician explained "'the way fentanyl works, it processes and metabolizes through the live[r], is stored in fat cells, and it can stay in your body for a long time.'" That report also included Allard's observation that Mother's fentanyl levels themselves were

"indicative of an individual who is not actively using fentanyl." Allard stated: "'[I]f she were to smoke[,] the results would be in the thousands, not the levels we are seeing.'" Allard further stated the positive results could be due to the concentration of the urine sample.

In the May 27, 2025 report, the social worker reported that during the most recent period of review, Mother tested negative for all substances tested through the drug patch. In the June 23, 2025 report, Mother's drug patch results showed she tested negative for all substances through June 9, except she tested positive for fentanyl during the May 14 to May 28 testing period. That positive test showed a fentanyl level of 3 ng/mL. Mother had previously tested positive for fentanyl at a level of 5 ng/mL during the March 20 to April 9 drug patch test period. Before that, she tested positive for fentanyl during the March 4 to March 20 drug patch test period at a level of 14 ng/mL, and before that, during the February 18 to March 4 drug patch test period, at a level of 16 ng/mL. Mother denied having relapsed or otherwise using illicit substances.

At the 12-month review hearing, the social worker testified she did not have any reason to believe Mother was then currently using as her most recent drug patch test results were negative and Mother had been "very cooperative and engaged" with the social worker. The social worker testified she had never seen Mother appear to be under the influence and did not have any concern regarding Mother being under the influence during visits. The social worker further testified, since December 2024, she "absolutely" noticed a change in Mother as Mother is "more engaged, more open," has admitted to past use when she had not done so before, and "appears to be forthcoming with information" and insight. Furthermore, no family member had reported

8

Mother using any illicit substances and the child's then current caregiver also acknowledged having seen a positive change in Mother.

Allard testified Mother attended their behavior health meetings on time consistently and was actively engaged in treatment. She testified, based on her observation of Mother's physical appearance, speech, and presentation, Mother did not present as a person actively using fentanyl.

Allard further testified, in her experience, it is not unusual for a client to have abstained from substances and still test positive for several months thereafter. She also observed Mother's test results generally reflect declining levels of substances in her system. With respect to fentanyl, Allard testified that, in her experience, "there's [no such thing as] a little bit of fentanyl" as recovering addicts do not typically microdose fentanyl. She testified, "[Y]ou're either using fentanyl or you're not" and symptoms of fentanyl use are typically pretty obvious. She also testified the extent to which drugs are detectable in urine samples depends on how diluted the sample is.

Mother testified her last use of any illicit substance was December 12, 2024. She testified about her past drug use and how therapy and other services have helped her. She testified she had initially resisted testing and other services because she did not realize how hard it would be to stop and she was also afraid to try because she heard people have died trying to stop using. She testified she understood her triggers, has cut out of her life friends who use drugs, is no longer in a relationship with Father, and has a big, supportive family helping her succeed.

Although Father consistently visited the child, completed a parenting class, and participated in individual counseling, Father did not make the same progress with his case plan. He stopped attending 12-step

9

meetings, he refused to submit to drug patch testing, and he otherwise failed to consistently drug test.

*B. The Juvenile Court Continues Services for the Parents for an Additional Six Months and the Child Appeals*

Following the 12-month review hearing, the juvenile court found, by a preponderance of the evidence, pursuant to section 366.21, subdivision (f), "return of the child to [the] parents would create [a] substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." The court also found reasonable services had been provided to the parents.

At the hearing, the juvenile court stated: "What I want to do, I do want to continue this for six months. I want to give the parents an additional opportunity—a little more time." The court stated it understood the parents were involved in "pretty significant long-term drug use" and that "it takes a few tries sometimes to get that on track and to make the appropriate adjustments." The court warned, "Going forward, the drug tests by the parents need to be completely, completely clean."

In its minute order dated July 2, 2025, the juvenile court stated it found pursuant to section 366.21, subdivision (g)(1) "there [was] a substantial probability the child will be returned to the physical custody of [the] parent . . . because the parent has (1) consistently and regularly contacted and visited the child, (2) made significant progress in resolving the problems that led to the child's removal from the home, and (3) demonstrated the capacity and ability to complete the objectives of their case plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." On that basis, the court found it to be "in the best interest of the child to extend the matter for another [six] months."

10

The juvenile court set the matter for a concurrent and contested 18- and 24-month review hearing and approved the October 2024 case plan report and visitation plan.

The child appealed from the juvenile court's order continuing services to the parents and setting a concurrent 18- and 24-month review hearing.

DISCUSSION

At the 12-month review hearing pursuant to section 366.21, subdivision (f), the juvenile court again determines whether a child should be returned to parental custody. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) "If the child is not returned to his or her parent because the juvenile court finds a substantial risk of detriment to the child exists, the court must terminate reunification services and facilitate the alternative permanent plan (generally by setting a hearing for the selection and implementation of a permanent plan . . . ) unless reasonable services have not been offered or provided or there is a substantial probability of return of the child within 18 months from the date of the child's removal from his or her home." (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 306.) "If the court finds there is a substantial probability the child could be safely returned to the custody of his or her parent with additional reunification services, the court may extend the reunification period to a maximum of 18 months from the date of the original removal order [citations] and set a further permanency review hearing pursuant to section 366.22." (*Ibid.*)

"[I]n order to find a substantial probability that the child will be returned to the physical custody of their parent . . . and safely maintained in the home within the extended period of time, the court shall be required to find all of the following: [¶] (A) That the parent . . . has consistently and

11

regularly contacted and visited with the child. [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent . . . has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)–(C).)

To justify the continuation of a child welfare proceeding beyond the 12-month review hearing, "there must exist more than just mere hope additional services will facilitate reunification." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1060.) The juvenile court must "essentially determine if the parent has demonstrated sufficient rehabilitation to complete the program plan in the extended time, as well as the ability to once more adequately provide for a child's emotional and physical well-being." (*Id.* at p. 1062.)

We review the juvenile court's determination of the substantial probability of the child's return to parental custody by the next review hearing for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–690.)

Here, substantial evidence supports the juvenile court's finding the child will be returned to parental custody by the 18-month hearing. The record shows both parents consistently and regularly contacted and visited the child. Substantial evidence shows Mother made significant progress in resolving the problems that led to the child's removal from the home and has demonstrated the capacity and ability to complete the objectives of the case plan and provide for the child's safety, protection, physical and emotional well-being, and special needs within the meaning of section 366.21, subdivision (g)(1). The record shows Mother has cooperated with the social

12

worker and engaged with the various aspects of the case plan by successfully participating, inter alia, in counseling, mental health treatment, and substance abuse rehabilitation and testing. Thus, sufficient evidence supports the court's order continuing reunification efforts as to Mother.

In the minor's brief, the child argues the juvenile court's order was in error because Mother had tested positive for illicit substances in the months leading up to the 12-month review hearing. But substantial evidence also shows Mother's positive tests could be attributable to residual amounts of substances that had not yet worked their way out of her system, and not to her continuing and active use of such substances. Allard testified that Mother did not present as though she were using. The social worker testified Mother had demonstrated a significant positive change since her asserted sobriety date of December 12, 2024, and never presented herself in a manner to suggest she was under the influence of illicit substances.

In the opening brief, the child also argues the juvenile court erred because Mother's "long-standing drug problems were not likely to be overcome with an additional six months of services." The child does not cite any evidence in the record supporting this argument.

Notwithstanding Father's failure to make the same level of progress in completing his case plan objectives, the juvenile court also ordered the continuation of services for Father until the 18-month review hearing. "[W]hen reunification efforts continue for one parent after the 12-month review hearing, a court has the discretion to offer services to the nonreunifying parent, and in many cases may choose to do so." (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 566.) The child does not explain how on this record the continuation of services to Father constituted an abuse of such discretion.

## DISPOSITION

The order is affirmed.

                                        MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.